(No. 84-CC-0685– 

HARRY W. KUHN REDI-MIX CONCRETE, JOSEPH BETTS, and HOME INSURANCE CO., Claimants, *v.* THE STATE OF ILLINOIS, Respondent.

*Opinion filed May 17, 1993.*

GUNTY & MCCARTHY, for Claimants.

ROLAND W. BURRIS, Attorney General (THOMAS L. CIECKO, Assistant Attorney General, of counsel), for Respondent.

OPINION

SOMMER, C.J.

This is an action for contribution by the State to the Claimants for damages for injuries caused to Steven Marple. The Claimants settled with Mr. Marple on August 19, 1983, for the sum of $190,000, and the

State was specifically released on April 19, 1984. This claim was heard in oral argument on October 26, 1992, and March 24, 1993, by this Court.

The first issue to be considered, even before we examine the facts, is whether the Claimants gave proper notice as per section 22—1 of the Court of Claims Act, 705 ILCS 505/22—1.

This Court has held:

"* * * a notice of intent to file a claim is a condition precedent to filing of a claim for contribution in the Court of Claims. In order to be timely, the notice and intent must be filed within one year of the good faith settlement and execution of a proper release, or within one year of being made a party to an underlying civil lawsuit." (*Hershey v. State* (1990), 43 Ill. Ct. Cl. 108, 116.)

The Attorney General takes the position that under the language of *Hershey, supra*, notice would have to have been filed on or before April 19, 1985, one year from the date of release of the State. No notice was filed, so the Attorney General requests that this claim be dismissed.

We find, however, that if the claim is filed within the notice period, no separate notice is necessary. (*Crosier v. State* (1987), 40 Ill. Ct. Cl. 203.) The original settlement in the underlying claim was entered on August 19, 1983, and was amended *nunc pro tunc* to include the State as a released party on April 19, 1984. The claim for contribution was filed in this Court on September 22, 1983. Therefore, under the rule in *Crosier, supra*, proper notice was given.

This Court notes an inconsistency in *Hershey, supra*. A party bringing a contribution claim in this Court would have been a party in the underlying action and would have been a party before execution of the releases. Therefore, one year from the effective

date of the releases would always be later than one year from having been made a party. *Hershey, supra,* at 115, does state that the contribution claim must be brought within one year of being made a party. However, we believe that the more complete statement of the rule, which we have quoted previously, which appears in *Hershey, supra,* at 116, is the rule to be applied to this claim. A rule requiring the giving of notice in the Court of Claims within one year of being made a party would catch many defendants in the underlying action by surprise, as such a rule is not in the formal rules of the Court of Claims. Additionally, a defendant may not be fully aware of all the potential liabilities within a year of being made a party. As a practical matter discovery is often incomplete at that point in time.

A rule allowing notice for one year after releases have been entered in settlement does work to the disadvantage of the State, as the State does not have the opportunity to participate in the underlying action and settlement. For that reason, we hold that this Court must make a finding of and an apportionment of liability in an action in which there was no notice filed prior to the execution of releases. In the circuit court, contribution must be a part of the original or underlying action, but where the State is a defendant, that is not possible. Therefore, we find that the rule allowing notice within one year of settlement gives the best opportunity for other parties and the State to make their claims and defenses against one another.

In this claim, the State was involved in an emergency snow removal operation on Route 56, Butterfield Road, on January 21, 1979. Butterfield Road was a two-lane roadway with a single eastbound lane, a single

westbound lane and a speed limit of 50 m.p.h. The area was rural and had no street lights. The goal of the snow removal operation was to remove all the snow from the south shoulder of the roadway and deposit it in a ditch which ran along the shoulder to the south.

In addition to two State-owned and operated vehicles, the State employed, by oral agreement, the services of Harry W. Kuhn Redi-Mix Concrete to aid in the operation. Pursuant to the agreement, Harry W. Kuhn provided a "Caterpillar" bulldozer-type vehicle (hereinafter referred to as Cat) and a Cat operator by the name of Joseph Betts.

The State trucks were operated by State employees Harold Engstrom and Leo Landell, respectively. The State trucks were assigned to provide protection for the Cat which was removing the snow from the shoulder of the roadway. The State trucks were entirely in the eastbound lane, one behind the other at all times prior to the incident. The trucks each occupied eight feet of the 12-foot wide eastbound lane. The trucks were each equipped with a Mars light on top, two directional lights which were mounted on top of the fenders, and headlights. As it was evening, the lights on the State vehicles were illuminating the area directly in front of the trucks and were set on high beam.

The two State trucks were approximately 40 to 50 feet apart and between them was the Cat. The Cat was equipped with a temporary Mars light mounted on the back and temporary headlights installed for the snow removal operation. The Cat was positioned at a right angle to the shoulder. The Cat would back up into the roadway and then proceed forward pushing the snow

from the shoulder of the roadway into a ditch next to the road. During the course of the operation, the Cat would cross the center line into the westbound lane about one-half of the time. It is undisputed that the Cat was left entirely exposed to traffic when it entered the westbound lane. There were neither flagmen assigned to the operation nor warning signs in advance of the operation.

On one occasion when the Cat reversed over the center line into the westbound lane, the Cat was struck by a vehicle operated by Steven Marple. Mr. Marple suffered injuries as a result of the incident. Following the accident, the snow removal operation proceeded; however, the trucks were positioned so that the Cat was not exposed when it crossed into the westbound lane.

On August 19, 1983, Harry W. Kuhn Redi-Mix Concrete and Joseph Betts reached a settlement agreement with Steven Marple in the amount of $190,000. Home Insurance Company, as subrogee, Harry W. Kuhn Redi-Mix Concrete, and Joseph Betts subsequently filed this action against the State of Illinois in the Court of Claims seeking contribution for payment made in excess of Claimants' *pro rata* share of the common liability.

While the record does include a list of Steven Marple's specials which total $50,214.63, there is no other testimony or reference to the nature, severity or permanence of his injuries.

The Claimants contend that the State was negligent in the hazardous execution of the snow removal project on January 21, 1979, at Butterfield Road, Route 56.

While it is well established that the State is not the insurer of highways, it is also clear that the State has a duty to keep highways reasonably safe. (*Smith v. State* (1989), 42 Ill. Ct. Cl. 19, 22.) The State has a duty to the public to use reasonable, ordinary care to maintain its roads and, while maintaining its roads, the State has the duty to exercise reasonable care so as not to create additional hazards. (*Smith, supra*, at 23.) Further, the State has a duty to warn if a condition is so unreasonably dangerous that a duty to warn the public or prevent the public in some manner from using that part of the roadway is necessary. *Walter v. State* (1989), 42 Ill. Ct. Cl. 1, 5.

Mr. Harold E. Engstrom, highway maintainer for the State of Illinois, was assigned to the highway maintenance operation on January 21, 1979. Mr. Engstrom testified that his specific assignment was to "block off the lane for traffic to protect the Cat." However, the State did not offer any protection or warning for the Cat when the vehicle crossed into the westbound lane of traffic. There were no advance warning signs or flagmen at the operation site.

Charles Muris, formerly a city traffic engineer in charge of the design and planning division of the bureau of traffic and engineering operations for the City of Chicago, testified as an expert witness for the Claimants. The expert testified that where there is only one available lane for traffic traveling in both directions, traffic maintenance and safety require flagmen at both ends of the operation and, at night, the flagmen should be equipped with torches or lights. He testified that in the instant situation all traffic should have been stopped completely when the Cat reversed into the

westbound lane of traffic. The expert further testified that a situation such as this required warning signs 500 feet in advance of the operation. It was the expert's opinion that the trucks themselves did not give adequate warning to motorists because of the relatively short distance between the State truck and the equipment blocking the moving lane of traffic. In addition, the bright lights of the truck would actually tend to blind a motorist. The expert concluded that all the facts considered together, including the rural curved roadway, the absence of street lights, the high speed, and the fact that only one lane of the road was accessible to motorists, mandated the use of advance warning signs.

The State criticized the expert for having failed to examine the site until 10 years after the date of the incident. This argument is not persuasive in the absence of any evidence in the record that the scene of the incident changed substantially over the 10-year period and that these changes would have somehow affected or changed the expert's opinion.

The testimony is undisputed that the trucks which were assigned to protect the Cat were approximately 40 to 50 feet apart in the roadway and that the Cat was in between the two State trucks at a right angle to the shoulder. The State did not provide motorists any warning of the hazardous condition except for the bright lights of the State trucks which may have tended to blind motorists. In the absence of an advance warning sign and/or flagmen, any vehicle traveling at 50 m.p.h. on an unlit and curved roadway would have virtually no notice that a hazardous condition existed in the west-bound roadway except for the headlights of the State truck in the eastbound lane.

The State assigned a truck with blinding headlights to the eastbound lane of traffic for the dual purpose of protecting the Cat's snow removal operation and warning motorists of the hazardous conditions in the roadway. The State failed to provide motorists with any type of warning signs or flagmen in advance of the operation. It is our finding that the State's failure to provide adequate protection for the Cat and the State's failure to provide proper warning constitute negligence on the part of the State.

The Claimants must, in order to prevail, prove by a preponderance of evidence that the Respondent breached its duty and that breach proximately caused the injuries to the Claimants. (*McGlynn & McGlynn v. State* (1985), 35 Ill. Ct. Cl. 104, 106.) Proximate cause is any cause which, in natural or probable sequence, produced the injury complained of. It need not be the only cause or the last cause or the nearest cause. It is sufficient if it concurs with some other cause acting at the same time, which, in combination with it, causes the injury. (Definition adopted by Court from Illinois Pattern Jury Instructions.) *Smith, supra.*

In the present case, the State's failure to adequately warn motorists of the hazardous condition in the roadway was clearly the proximate cause of the resulting injuries. However, this Court must examine whether the State's negligence was the sole proximate cause or a contributing factor in the resulting injuries.

The State orally contracted with Harry W. Kuhn Redi-Mix Concrete to perform a service. The agents of the State advised Kuhn's employee that the goal of the operation was to remove the snow from the south shoulder of the roadway and push it back as far as possible.

The record is silent on whether the State required Kuhn's agent to accomplish the goal in any specific manner. In the course of the operation, Kuhn's agent, Joseph Betts, crossed the center line from the eastbound portion of the roadway where he was protected by a State vehicle, into the westbound portion of the roadway where the Cat was left entirely exposed to motorists. Betts testified that he looked to the left and right, checking for traffic each time that he crossed into the exposed roadway. It is clear from the record that Betts knew that he was exposed to vehicle traffic each time he crossed the center line. Betts never objected to the manner in which the operation was carried out although he "didn't necessarily agree with it."

Harry W. Kuhn Redi-Mix Concrete provided the equipment and an equipment operator who was presumably qualified to perform the service. Betts, who had eight years' experience as an equipment operator, acknowledged the curved roadway, the absence of protection to his vehicle when he crossed the center line of the roadway, and the bright lights of the State vehicles, yet he proceeded, without objection, to perform the service in a manner which was clearly dangerous. Betts failed to exercise reasonable care for his own safety or for the safety of others. His actions constituted negligence. The actions and omissions of the State in the present case, combined with the action of Betts, were together the proximate cause of the injury to the party herein.

Harry W. Kuhn Redi-Mix Concrete reached a "good faith" settlement with Steven Marple in the amount of $190,000 in exchange for a release from liability for Harry W. Kuhn Redi-Mix Concrete, Betts,

and the State of Illinois. Steven Marple accepted $190,000 to release the parties. It is our view that the totality of the damages were fixed then at $190,000 and as there was a "good faith" finding, the damages remain only to be apportioned between Kuhn and the State. Any amount attributable to Mr. Marple's negligence has been factored into the settlement.

We have made the finding that both parties were negligent. We note that the complaint for contribution states that the State was 50% of the fault, that the Home Insurance Company paid $190,000 to Steven Marple on behalf of Harry W. Kuhn Redi-Mix Concrete and Joseph Betts, and that the prayer for relief asks for $95,000.

The Claimants' attorney has argued both in the briefs and the oral arguments that the State was entirely or mostly at fault and is liable for an amount in excess of $100,000. This argument is made on the theory that this was a "case sounding in tort arising out of a vehicle owned, leased or contracted by the State," and in such cases the $100,000 limit does not apply. (705 ILCS 505/8.) We find that the situation in the present case was no different than the thousands of times a year that the Department of Transportation contracts with independent contractors who provide vehicles owned by them and drivers paid by them. The State outlines the goals and details of the job and sometimes participates, but does not lease or control the vehicles provided by the contractors. Therefore, the exception to the $100,000 limit does not apply in this claim.

Secondly, the Claimants' attorney argues that there are multiple Claimants, each entitled to $100,000. We

disagree. As the Home Insurance Company has paid the entire liability of Harry W. Kuhn Redi-Mix Concrete and Joseph Betts, it is subrogated to those parties' right to contribution from the State. (790 ILCS 100/2.) Therefore, Home Insurance Company is the only Claimant with an interest. Any liability of Betts was imputed to Harry W. Kuhn Redi-Mix Concrete Company whose right to contribution became the right to contribution of the Home Insurance Company when it paid the liability. With only one Claimant with an interest, the maximum liability to the State in this claim is $100,000.

Upon examination of the record, we find that both parties were equally at fault, and that the State should contribute 50% of the settlement to the Home Insurance Company.

We therefore award the Home Insurance Company $95,000 in full and complete satisfaction of its right to contribution against the State for monies paid arising from injuries caused to Steven Marple.