In the
United States Court of Appeals
For the Seventh Circuit

No. 99-1794

Roxanne Tidemann,

Plaintiff-Appellant,

v.

Nadler Golf Car Sales, Inc.,

Defendant-Appellee.


Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 91 C 4053--Charles R. Norgle, Sr., Judge.


Argued January 18, 2000--Decided August 17, 2000


  Before Easterbrook, Kanne, and Diane P. Wood, Circuit
Judges.

  Diane P. Wood, Circuit Judge.  Roxanne Tidemann
was severely injured when a Club Car golf car
that she was attempting to operate suddenly
lurched forward and crashed into a garage door.
Tidemann sued Nadler Golf Car Sales, Inc., which
had reconditioned the car and sold it to her
employer. Tidemann raised both strict liability
and negligence theories. The district court
dismissed the former as a matter of law; the jury
returned a verdict for Nadler on the latter.
After the trial, the district court awarded
Nadler costs pursuant to Federal Rule of Civil
Procedure 68. Tidemann now appeals. With respect
to everything except the award of costs, which
requires further proceedings on remand, we
affirm.

I

  Club Car Inc. manufactures golf cars that
sometimes wind up in areas of service other than
golf courses. Typically, prior to resale, the
cars are reconditioned by dealers such as Nadler.
In 1989, Nadler sold a used car to a real estate
developer, Homes by Hemphill, which planned to
use the car in performing various service
functions around its developments. Tidemann was
working for Hemphill as a home sales
representative on July 14, 1989, when Nadler

delivered the car to Hemphill. According to the testimony of one of Nadler's delivery representatives, the car was left with a Hemphill employee who claimed to know the safety information about the car. Even so, the representative said that he explained how to operate the car anyway. The car was then left on a driveway roughly 18 inches in front of a closed steel garage door.

Tidemann was the first Hemphill employee to try to use the car. When she got in, she had difficulty starting it. She then looked around for various instructions and warning labels, but the only information came from a label on the steering wheel. That label instructed Tidemann to make sure that the wheels were pointed in the right direction (they were) and to read the owner's manual (which Nadler had not provided). Tidemann says that she then looked at the shift mechanism and put it into what she believed to be reverse (it has three positions--forward, neutral, and reverse). She then pressed the accelerator pedal, but nothing happened.

Tidemann then decided to try turning the ignition key. She turned it 90 degrees and tried again to back out, but still nothing happened. She then turned the key still another 90 degrees, but again the car did not respond. At this point, she concluded that something was awry and that she should turn the car off. She moved the transmission lever to what she thought was neutral, then returned the key to its original position. Suddenly, the car lurched forward, crashing through the garage door. The garage door struck Tidemann in the face, causing extremely serious injuries.

Tidemann and Nadler have quite different characterizations of how much work Nadler performed on the car. Tidemann suggests that Nadler basically rebuilt the car from scratch, whereas Nadler's account sounds like little more than a tune-up. At this stage, however, the characterization is not terribly important. It is not disputed that Nadler follows a checklist that has several steps that are relevant here. One is that Nadler checks the reverse buzzer, which should have sounded had Tidemann really been in reverse as she intended. More significantly, Nadler "tighten[s] all nuts and bolts, all wire connections, and forward-reverse lever screw." Additionally, Nadler inspects the ignition and key switch, a step that requires it to remove part of the car's plastic dashboard.

Although the parties dispute both the cause of the accident and the various problems with the golf car at the time it was delivered to

Hemphill, Tidemann points to five basic defects that she says led to her injuries. They are:

(1) A loose key switch mechanism, which according to Tidemann allowed the key to turn nearly 180 degrees without completing the circuit and turning on the car. As a consequence of this, Tidemann was unable to tell whether the car was on or off when she was trying to put it in neutral and get out of it. (The car is electric, so there is no idle sound or vibration that would indicate a running engine.) Because of this spinning, the key housing could turn, make contact, and activate the car even when the user was trying to turn the car off.

(2) An altered housing for the key switch that changed the opening from a "D" shape (that would prevent key switch spin) to a complete circle (which allowed the switch to spin).

(3) An improperly reconditioned shift lever (discussed in more detail below). This problem made it difficult to tell if the car was in forward, neutral, or reverse.

(4) No owner's manual came with the car.

(5) Certain warning labels specified by Club Car service documents and specifications were not included.

Tidemann sued Nadler in federal court, invoking diversity jurisdiction and arguing that Nadler was both strictly liable and negligent. Nadler then brought a third-party complaint against Club Car, which eventually settled out. Tidemann's strict liability theory was dismissed as a matter of law, but her negligence claim went to the jury. The jury returned a verdict on that part of the case in which it apportioned 82% of the fault for the accident to Tidemann and 18% to Nadler. Under Illinois law, this meant that Tidemann lost entirely. See 735 ILCS sec. 5/2-1116 (West 1994). Nadler then moved for costs under Rule 68, reasoning that since Tidemann had turned down an offer of $5,000 in 1994 and had ended up with a less favorable result after trial, it was entitled to the costs incurred in obtaining judgment. The district court agreed and awarded $38,213 in costs. Tidemann now appeals.

II

Tidemann argues that the jury's unfavorable view of her negligence claim was the result of a collection of adverse trial rulings that, in the aggregate, denied her a fair trial. The most important of these asserted errors fall into two general categories--evidentiary rulings and jury

selection procedures. With only one exception relating to the interpretation of a stipulation between the parties, the district court has broad discretion in both of these areas, and we review its decisions only for abuse. See United States v. Hunter, 145 F.3d 946, 951 (7th Cir. 1998) (evidentiary rulings); United States v. Magana, 118 F.3d 1173, 1206 (7th Cir. 1997) (jury matters).

The most difficult of the evidentiary issues relates to the testimony of Tidemann's mechanical engineering expert, Robert Tarosky. Tarosky testified that when he examined the car, he found that the set screw that connects the directional lever to the control shaft was not properly positioned. This increased the amount of movement in the directional lever and made it difficult to tell whether the car was in forward, reverse, or neutral. The sticky problem was that Tarosky did not examine the car until 1993, four years after the accident occurred. Needless to say, this created foundational concerns because of the possibility that the set screw had been modified or damaged between the time of the accident and the time of Tarosky's examination. Tidemann countered with a stipulation that read as follows:

The Plaintiff and Nadler Golf Car Sales, Inc. stipulate and agree that the golf car involved in this case was not used for approximately two years after the accident. It was then moved to a new location and put into use. The only adjustment made before putting it into use was to tighten the key switch. Otherwise, the golf car remained in substantially the same condition from the date of the accident through the end of 1993.

Tidemann argues that Nadler stipulated that the condition of the set screw did not change, eliminating any foundational problems. The district court disagreed, reading the stipulation as covering only the general condition of the car, not every part, no matter how small. It thus decided to exclude Tarosky's testimony about the excessive movement of the shift lever.

Since the stipulation amounts to a contract and no extrinsic evidence of its meaning was presented by either side, we review the district court's interpretation of it de novo. Braxton v. United States, 500 U.S. 344, 350 (1991). On that basis, we cannot agree with the district court's reading. While the phrase "the golf car remained in substantially the same condition" standing alone could be read to refer only to the car's general condition, the other language in the stipulation overcomes such an interpretation. The stipulation refers to a very specific change (the

tightening of the key switch) and says that the car was "otherwise" unchanged. This indicates that Nadler stipulated that there was one small change and no others.

Our disagreement with the district court's interpretation of the stipulation does not end matters, however. The court also indicated that "there [was] a substantial [Fed. R. Evid.] 403 issue clearly here." In its view, the probative value of testimony concerning the condition of the set screw after two more years of use was minimal. With such a weak foundation, the court was concerned that Tarosky's testimony could confuse or mislead the jury and thus create a danger of undue prejudice to Nadler. Consequently, the court also relied on Rule 403 to exclude Tarosky's statements. This is an independent ground for the ultimate ruling under which the evidence was excluded, and unlike the stipulation, it is one that we review only for abuse of discretion. United States v. Hunter, 145 F.3d 946, 951 (7th Cir. 1998). While we would have no reason to relieve Nadler of the consequences of its stipulation if that were the only ground cited by the district court, the abuse of discretion standard of review leaves us no reason on this record to second-guess the trial judge with respect to the Rule 403 balance. In the end, we cannot say that the decision to exclude Tarosky's testimony was so far out of bounds as to constitute reversible error.

Tidemann's other objections to the trial court's evidentiary rulings can be dealt with more quickly. Most of them relate to the testimony of Christopher Shaxted, Tidemann's supervisor at Homes by Hemphill. Initially, Tidemann had planned to call Shaxted both as a fact witness (because he talked with her shortly after the accident) and an expert (offering his estimation of her lost income based on his expertise in the residential real estate industry). However, it turned out that Shaxted made statements in a 1992 deposition that severely undermined Tidemann's case. Consequently, Nadler ended up putting him on the stand.

Tidemann first says that Shaxted's testimony should have been barred because of a supposedly improper ex parte contact between Nadler's counsel and Shaxted. Apparently, Nadler's attorney contacted Shaxted and served a subpoena without notifying Tidemann's counsel. Tidemann maintains that Nadler violated the usual rule prohibiting ex parte contacts with experts from the opposing side. See, e.g., Erickson v. Newmar Corp., 87 F.3d 298, 301-02 (9th Cir. 1996). However, the two justifications for this rule-- that the expert may have confidential information

that should be protected from the adversary and that the Federal Rules of Civil Procedure heavily regulate the use of experts--are not applicable here. Nadler's contact with Shaxted (which was in fact just to tell him when to show up) had nothing to do with his expert role (which related to Tidemann's lost real estate sales income). Nadler was interested in him solely as a fact witness; its contact with him was entirely innocent; and we therefore see no abuse in the district court's decision to permit his testimony.

Additionally, Tidemann claims that the district court improperly allowed the use of Shaxted's 1992 deposition for the purpose of impeaching his testimony. More specifically, Nadler wanted to impeach Shaxted's trial testimony (which favored Tidemann's account of what happened) with his statement in deposition that Tidemann "indicate[d] to [him] that the car was in gear when she was trying to start it." Tidemann now maintains that the trial court allowed the use of Shaxted's impressions for impeachment purposes and that this was contrary to our opinion in United States v. Allen, 798 F.2d 985 (7th Cir. 1986). Allen, however, addressed an entirely different issue. Allen held that a federal agent's impressions of what a witness said were outside of the scope of the Jencks Act because the agent's impressions of what a witness said could not be used to impeach the witness. Allen might be relevant if Nadler had wanted to use Shaxted's impressions to impeach Tidemann. But that was not its game plan. It wanted instead to use the earlier statements to impeach Shaxted himself. Tidemann presents no reason why this would be improper.

Finally, Tidemann argues that the district court should have allowed the deposition testimony of Chuck Rogers, a Club Car reconditioner who she proffered to give testimony about the proper method of reconditioning Club Car key switches. The district court decided that since the jury could look at the switch itself and since the proper way of reconditioning it was "almost a question of common sense," there was no need to allow Rogers's deposition. It excluded the deposition under Rule 403. We confess to some discomfort about the way the judge phrased this: expert testimony is often necessary precisely because the layperson's "common sense" will cause her to overlook something that an expert knows is important. Nevertheless, because the judge again relied on Rule 403, and because Tidemann presents no argument suggesting that the court's decision was an abuse of discretion (other than the implication that the court had too rosy a view of the jurors' mechanical sophistication), we again

defer to the trial judge's assessment of the evidence.

Tidemann also claims that the jury was unfairly tainted against her. First, she points to the presence of juror Christie Swenson, who she says should have been dismissed for cause. Tidemann was concerned that Swenson (1) would have to catch a 5:45 A.M. train in order to make it to court on time and (2) owned a golf car that was used on her family farm. It goes without saying that Tidemann's theory that early birds are unfit to serve as jurors is meritless. Nor do we see any abuse of discretion in the district court's willingness to allow Swenson to serve even though she owned a golf car. The court established during voir dire that Swenson did not even know the manufacturer of her car, nor was there any other reason to believe that she would be any more biased against Tidemann than car owners in an automobile products liability case.

Next, Tidemann complains that the district court unfairly granted the defendants (Nadler and Club Car at the start of the trial) three peremptory challenges each (for a total of six on the defense side), while it gave her only three. Under 28 U.S.C. sec. 1870, multiple defendants may be "considered as a single party for the purposes of making challenges, or the court may allow additional peremptory challenges and permit them to be exercised separately or jointly." In other words, the allocation of peremptories in multiple defendant cases is left to the discretion of the trial court. Neither side cites to, nor could we find, a reported appellate decision that holds that the district court's allocation of peremptories under sec. 1870 was an abuse of discretion. That is not to say that it could never happen, but it does suggest that Tidemann has a steep hill to climb. She presents nothing to suggest that her case was somehow extraordinary or that the allocation of peremptories was otherwise patently unfair, and so we find no abuse of discretion here, either.

In short, none of the district court's decisions relating either to the evidence presented or the composition of the jury constitutes reversible error. Tidemann lost before the jury and she has offered no persuasive reason why we should upset its decision.

III

Tidemann also maintains that the district court erroneously granted Nadler judgment as a matter of law on her strict liability claim. The parties make much of whether there was sufficient evidence of a causal link between whatever

defects existed at the time the car left Nadler's control and Tidemann's eventual injury. They also argue about whether under Illinois law a seller or reconditioner of used goods can ever be liable under a strict products liability theory. Many cases suggest that the answer to this question is no. See, e.g., Peterson v. Lou Bachrodt Chevrolet, 329 N.E.2d 785, 787 (Ill. 1975); Timm v. Indian Spring Recreation Ass'n, 543 N.E.2d 538, 541 (Ill. App. Ct. 1989); Abel v. General Motors Corp., 507 N.E.2d 1369, 1376 (Ill. App. Ct. 1987). Tidemann argues that these are distinguishable because of the amount of work that Nadler performed as well as its relationship with Club Car, the original manufacturer. Additionally, the recently published Third Restatement of Torts suggests that where, as here, a reseller remanufactures a product and advertises it as "like new," products liability doctrines may apply. See Restatement (3d) of Torts: Products Liability sec. Eight.

We need not offer a non-binding guess as to whether Illinois courts would agree with Tidemann's distinctions or would follow the Third Restatement's lead on this issue. Under applicable Illinois law, "In all actions on account of bodily injury or death or physical damage to property, based on negligence, or product liability based on strict tort liability, the plaintiff shall be barred from recovering damages if the trier of fact finds that the contributory fault on the part of the plaintiff is more than 50% of the proximate cause of the injury or damage for which recovery is sought." 735 ILCS sec. 5/2-1116; Freislinger v. Emro Propane Co., 99 F.3d 1412, 1417 (7th Cir. 1996); Hobart v. Shin, 705 N.E.2d 907, 910-11 (Ill. 1998). (This section was subsequently amended and those amendments were then invalidated by the Supreme Court of Illinois in Best v. Taylor Machine Works, 689 N.E.2d 1057 (Ill. 1997). Those developments, however, are of no moment to this case because the amendment applied only to causes of action accruing after March 9, 1995. See 735 ILCS sec. 5/2-1116(e) (Supp. 1999).) Section 5/2-1116 makes clear that it does not matter whether a plaintiff's case is based on negligence or "product liability based on strict tort liability." If the jury concludes that her own negligence was more than 50% of the cause of her injuries, then no damages are to be awarded regardless of the different theories of liability that a plaintiff might assert. Here, the jury decided that Tidemann was 82% responsible for what happened to her. There is no reason to think that the jury would have changed its opinion of the role that Tidemann's negligence played in her accident had it also been instructed in an alternate theory of Illinois products liability

law, especially since the district court rightly presented Nadler's sec. 2-1116 affirmative defense to the jury as an entirely separate issue. So, even if Tidemann is correct that Illinois law would allow a strict liability claim under these circumstances, Nadler proved to the jury an affirmative defense that would have overcome this theory.

IV

Finally, Tidemann appeals the district court's decision to award $38,213 in costs to Nadler. Nadler argues, and the district court agreed, that when it made an offer to Tidemann to settle her case for $5,000, it triggered Rule 68, which provides that "[i]f the judgment finally obtained by the offeree is not more favorable than the offer, the offeree must pay the costs incurred after making the offer." The district court concluded that since losing (and therefore getting nothing) is worse than getting $5,000, Rule 68 applied and Nadler was therefore entitled to the $38,213 in costs that it incurred subsequent to its offer. This ruling overlooked the Supreme Court's opinion in Delta Airlines v. August, 450 U.S. 346 (1981), where the Court held that Rule 68 costs are available only to a plaintiff who obtains judgment in her favor, but recovers less than the settlement offer. It does not apply to a case like this one, where the judgment is for the defendant. Id. at 352. See also Stomper v. Amalgamated Transit Union, 27 F.3d 316, 319 (7th Cir. 1994) (requiring a "positive award" to the offeree to trigger Rule 68); Lentomyytni Oy v. Medivac, Inc., 997 F.2d 364, 368 (7th Cir. 1993) (following Delta Airlines).

The question remains whether Nadler has forfeited the right to obtain its proper costs because it cited the wrong Federal Rule of Civil Procedure to the district court. Under Rule 54(d), as the prevailing party, it was entitled to its costs unless the court otherwise directed. The proper measure of those costs is set forth in 28 U.S.C. sec. 1920. The amount of costs the court calculated using Rule 68 bore no necessary relation to the proper measure of costs allowable under sec. 1920, but we conclude that Nadler is entitled to the latter. We therefore vacate the district court's cost award and remand the issue of costs for recalculation under the proper standards.

V

For the forgoing reasons, we Affirm the judgment of the district court with respect to all aspects of this case except for the award of costs under

Rule 68. That portion of the judgment is Vacated and Remanded for further proceedings consistent with this opinion.