(No. 90-CC-3072–

J. W. and DOROTHY TODD, Claimants, *v.*
THE STATE OF ILLINOIS, Respondent.

*Order filed January 17, 2001.*

NASH, NASH & BEAN (JOHN W. BEAN, of counsel), for Claimants.

JIM RYAN, Attorney General (MARK MARLOTT, Assistant Attorney General, of counsel), for Respondent.

## ORDER

MITCHELL, J.

This claim arises from an accident which occurred on June 2, 1988, on Interstate Highway 80 ("I-80"), east

of the Princeton interchange, when a Dodge van being operated in the eastbound direction by Claimant J. W. Todd, in which Claimant Dorothy Todd was a passenger, collided with vehicles being operated in the eastbound direction by employees of Respondent's Illinois Department of Transportation ("IDOT"). Claimants allege in their complaint that the vehicles being operated by IDOT employees, who were engaged in a weed spraying operation, were straddling the left boundary of the eastbound passing lane in such a way that the vehicles constituted a moving obstruction of the passing lane. Claimants further allege in their complaint that the collision was the result of one or more of the following negligent acts or omissions on the part of IDOT and its employees:

"(A) Failed to warn Plaintiff of the obstruction as required by Chapter 95½, §11—303(a), Illinois Revised Statutes.

(B) Failed to temporarily close the passing lane of Interstate 80 for the protection of the public.

(C) Failed to plainly and conspicuously mark with signs a detour to guide traffic around that part of the highway so obstructed as required by Ch. 121, §4—407, Illinois Revised Statutes.

(D) Drove the flashing arrow sign vehicle in such a manner as to follow too closely the spraying truck, thereby giving inadequate notice of the traffic obstruction and danger.

(E) Drove the flashing arrow sign vehicle in such a manner as to obstruct the passing lane of the highway, instead of on the shoulder of the road.

(F) Failed to place a series of warning signs on both sides of the roadway over sufficient distance in advance to warn of the lane closure or obstruction.

(G) Failed to supervise the placement of traffic control devices so as to warn Plaintiff of the imminent danger created by the moving maintenance obstruction.

(H) Negligently and carelessly owned, operated and controlled the Defendant's motor vehicles.

(I) Negligently and carelessly failed to keep a proper lookout."

A hearing was conducted in Springfield, Illinois on September 9, 10, and 11, 1998. Both parties filed briefs.

On the day before the hearing Respondent filed, pursuant to section 2—613(d) of the Illinois Code of Civil

Procedure (735 ILCS 5/2—613(d)), a motion for leave to file affirmative defenses instanter. Section 2—613(d) states:

"The facts constituting any affirmative defense, such as payment, release, satisfaction, discharge, license, fraud, duress, estoppel, latches, statute of frauds, illegality, that the negligence of a complaining party contributed in whole or in part to the injury of which he complains, that an instrument or transaction is either void or voidable in point of law, or cannot be recovered upon by reason of any statute or by reason of nondelivery, want or failure of consideration in whole or in part, and any defense which by other affirmative matter seeks to avoid the legal effect of or defeat the cause of action set forth in the complaint, counterclaim, or third-party complaint, in whole or in part, and any ground or defense, whether affirmative or not, which, if not expressly stated in the pleading, would be likely to take the opposite party by surprise, must be plainly set forth in the answer or reply."

Respondent's motion asserted that J. W. Todd was guilty of failure to keep a proper lookout, speeding, failure to take proper measures to avoid a collision, and failure to keep his vehicle under control. Respondent contended in its motion that the assertion of affirmative defenses would not take Claimants by surprise. The motion was heard on the morning the hearing started. Claimants claimed prejudice with respect to the preparation of Claimants' expert witness, whose evidence deposition was taken over seven months prior to the filing of the motion. Claimants also claimed surprise as to the affirmative defense of speeding, which was alleviated by Respondent moving to delete that affirmative defense. Claimant further objected to the remaining affirmative defenses based on the failure of Respondent to allege facts showing good cause. The Commissioner granted Respondent's motion on the basis that the affirmative defenses would not take Claimants by surprise.

Claimants contend in their brief that the granting of Respondent's motion was in error. Claimants assert that the issue as to whether the motion should have been granted or denied was not one of surprise, but whether

the Respondent alleged and showed good cause for failing to timely file the affirmative defenses. They cite Court of Claims Regulation 790.100 (74 Ill. Adm. Code 790.100), which provides:

"The respondent shall answer within 60 days after the filing of the complaint, and the claimant may reply within 30 days after the filing of said answer, unless the time for pleading be extended pursuant to Section 790.55(f); provided however, if the respondent fails to answer, a general denial of the facts set forth in the complaint shall be considered as filed * * *. Respondent, upon good cause shown, may thereafter, by leave of Court, be permitted to file affirmative pleadings. * * *."

Claimants note that in Respondent's motion and argument in favor of the motion, Respondent gave no cause for failing to file the affirmative defenses on a timely basis, other than Respondent's attorney, and his predecessors, inadvertently failed to file affirmative defenses to Claimant's complaint. In support of their position, Claimants cite in their brief *Carlisle v. Harp* (5th Dist. 1990), 200 Ill. App. 3d 908, 146 Ill. Dec. 355, 558 N.E.2d 318; *Bright v. Dicke* (3rd Dist. 1994), 260 Ill. App. 3d 768, 199 Ill. Dec. 292, 633 N.E.2d 1283; and *Hobart v. Shin* (1st Dist. 1997), 292 Ill. App. 3d 580, 226 Ill. Dec. 834, 686 N.E.2d 617. Respondent did not cite any cases in its brief in response to the cases cited by Claimants.

In *Carlisle,* the defendant's attorney started arguing comparative negligence in his opening statement to the jury. Plaintiff objected on the ground that the plaintiff's comparative negligence was never affirmatively pleaded by the defendant as an affirmative defense and therefore plaintiff's comparative negligence was not properly before the jury. Defendant contended on appeal that the trial court erred in refusing to allow the defendant to amend his answer to allege the plaintiff's comparative negligence after the trial had begun. The Fifth District Appellate Court ruled that the defendant's mistake of failing to allege plaintiff's negligence as an affirmative defense, which

was not discovered until trial, does not constitute a good reason for not filing the affirmative defenses with the original pleading.

In *Bright*, the defendant moved for leave to file a late response to a request to admit. The defendant acknowledged that, aside from her claim that the plaintiff was not prejudiced, she could not establish good cause for the late filing of her response. The defendant's motion was denied by the trial judge. On appeal the Third District Appellate Court ruled that under Supreme Court Rule 183 (134 Ill. 2d R. 183), which provides for the granting of motions for extensions of time for good cause, a trial court has discretion to allow a late response to a request to admit for good cause. After determining that a trial court may allow a late response for good cause, the Appellate Court ruled, based on *Greene v. City of Chicago* (1978), 73 Ill. 2d 100, 22 Ill. Dec. 507, 382 N.E.2d 1205, that good cause under Supreme Court rule 183 required more than inadvertence, mistake or lack of prejudice to the opposing party. In *Greene*, the Supreme Court, citing both Supreme Court Rule 183 and section 59 of the then Civil Practice Act (Ill. Rev. Stat. 1977, ch. 110, par. 59 (current version at 735 ILCS 5/2—1007)) held that mere inadvertence was not sufficient to constitute good cause for an extension of time to file a late jury demand. The Supreme Court also rejected the plaintiff's contention that good cause could be established by showing lack of inconvenience or prejudice to the opposing party.

In *Hobart v. Shin* (1st Dist. 1997), 292 Ill. App. 3d 580, 226 Ill. Dec. 834, 686 N.E.2d 617, the trial court allowed defendant leave to amend his answer to add the affirmative defense of contributory negligence 5½ years after the original complaint had been filed and only a few days before the trial. The First District Appellate Court

ruled that granting the defendant's motion was prejudicial to the plaintiff when the defendant offered no explanation for the late filing and none was apparent from the record. According to the Appellate Court, the untimeliness of the affirmative defense was prejudicial to the plaintiff in that she was denied the opportunity to adequately prepare for trial because she was unable to prepare and examine several experts as to the issues raised by the affirmative defenses.

In this claim at bar, Court of Claims Regulation 790.100 provided that a general denial was deemed filed after Respondent failed to file an answer within 60 days. Court of Claims Regulation 790.100 further provided that Respondent, upon good cause shown, could thereafter by leave of the Court be permitted to file affirmative pleadings. In Respondent's motion to file affirmative defenses and argument in favor of the motion, Respondent failed to give any reason for failing to file the affirmative defenses on a timely basis other than inadvertence.

This Court agrees with Claimants that the issue as to whether Respondent's motion should have been granted or denied was not one of surprise, but whether Respondent alleged or showed good cause for failing to timely file the affirmative defenses. According to the cases cited by Claimants, it appears that Respondent's motion was improperly granted. While a trial judge has discretion in determining what constitutes good cause, the Supreme Court in *Greene* and the Third District Appellate Court in *Bright* have determined that good cause requires more than inadvertence, mistake or lack of prejudice to the opposing party. Respondent's only reason for failing to timely file the affirmative defenses was inadvertence. Therefore, the ruling granting Respondent's motion is reversed and, accordingly, this claim shall be considered by

this Court as if comparative negligence by Mr. Todd is not in issue.

There were two trucks involved in the weed spraying operation being conducted by IDOT on the day of the accident. The lead truck ("spray truck"), a GMC Sierra 350, contained two employees, James Galle and Larry Galle. James Galle was driving the truck while Larry Galle was situated in the back of the truck where he was operating the spraying mechanism. The spraying mechanism extended out of the bed of the driver's side of the truck. Behind the spray truck was an International 3-ton truck ("nurse truck") being driven by Mark Holtschult. This truck was pulling an arrow board trailer which had a flashing arrow directing traffic to move from the passing lane to the driving lane.

James Galle testified that on the morning of June 2, 1988, the crew was instructed by IDOT engineer Dick Bussen to continue spraying the gravel area on the median side of eastbound I-80. After spraying in the morning, the crew broke for lunch at approximately 11:15 a.m. Following lunch the crew checked the safety devices on the vehicles as well as the arrow board. The safety devices on the spray truck consisted of a revolving light on top of the truck, flashing lights located in the front and rear of the truck, and an orange "slow" sign mounted on the rear of the truck with two triangular boards above it. The safety devices on the nurse truck driven by Mark Holtschult consisted of a revolving light on top and flashing lights on the front and rear of the truck. After determining that the safety devices on both trucks and the arrow board were functioning the crew resumed the spraying operation.

James Galle testified that the left wheels of the spray truck were being driven about one foot left of the yellow line marking the left edge of the passing lane of I-80.

Though he stated he was driving the truck between 5 and 10 miles per hour, he admitted giving a prior statement that he was traveling 5 miles per hour or less. James Galle testified he had probably half of his truck or less in the passing lane of I-80. He admitted, however, that he had previously given a statement when he was asked the question, "So most of your vehicle then was in the left lane of the highway?" and had answered, "Quite a bit of it, yes." James Galle testified that it was his job to watch ahead of the operation, and to observe the spraying out the left window and mirror.

After looking at Respondent's Exhibit 22, a photograph of the location of the accident, James Galle testified that there was a slight curve in the highway from the accident scene towards Princeton. He further testified that I-80 is a heavily traveled highway and that semi-tractor trailer trucks drive I-80 on a regular basis, but he did not notice a semi-tractor trailer truck in the vicinity of the accident immediately prior to the impact. James Galle also did not see the van being driven by Mr. Todd at any time prior to the accident.

Larry Galle testified that his job on June 2, 1988 was to operate the boom mechanism used to spray weeds. He was seated on the flatbed of the spray truck facing the left side of the truck to observe the weed spraying operation. He testified that the truck being operated by Mark Holtschult was approximately 100 to 150 feet behind the spray truck and that the left front wheel of Mr. Holtschult's vehicle was a foot left of the yellow line marking the left edge of the passing lane. Larry Galle testified that a majority of the vehicle being driven by Mr. Holtschult was in the passing lane of traffic. Larry Galle testified that he heard the collision of the Todd vehicle with the sign trailer and the Holtschult truck and then turned to observe

the Todd vehicle half a second to a second before it collided with the back of the vehicle in which he was riding. He testified that the Todd van impacted the right rear flatbed portion of the spray truck.

Larry Galle acknowledged that I-80 is a busy highway with a lot of truck traffic. He did not recall the spraying operation having any close calls on the day of the accident or the day before. He indicated that if there had been any close calls he would have talked about them with his co-workers.

Mark Holtschult was the driver of the nurse truck that was pulling the arrow board trailer. He testified that he drove the truck approximately 90 to 100 feet behind the spray truck and that the yellow line marking the left edge of the passing lane was kept right in the middle of his truck as he drove down the highway. Mr. Holtschult testified that he first observed the Todd vehicle through his right rear view mirror when it was about 300 feet behind his truck and that he tried to maneuver the truck toward the median. He estimated that 3 feet of his truck and the arrow board trailer were still in the passing lane at the time of impact. Mr. Holtschult drove the truck forward about 2 to 3 seconds before the Todd van struck the back right portion of the arrow board trailer and the back right corner of the spray truck. He testified that from the time the Todd van struck his vehicle until its impact with the spray truck "seemed instantaneously, just hit me and boom."

Mr. Holtschult testified that he thought the passing lane was partially closed. Between the time he first observed the Todd van in his right rear view mirror and the time of the impact, he did not see any semi-trucks passing him on the right, or in the non-passing lane. He also testified that he did not observe every semi-truck that passed

his truck as he was traveling down the highway. Mr. Holtschult testified that he had observed semi-trucks that came up close to the rear of the state vehicles and then swerve over into the driving lane of traffic. He stated, "* * * they would get close enough to bother you * * *," before the semi-trucks changed lanes. Mr. Holtschult further testified that he did not see any vehicles other than the Todd van remain in the passing lane of traffic, that he would consider such an event a safety hazard, and that he would have notified his supervisor of such an event.

Mr. Holtschult testified that he was trailing behind the spray truck at a distance of approximately 100 feet. He had been instructed to keep traffic from getting between his truck and the spray truck, but he had not been instructed as to any standard regarding the distance he should follow the spray truck. Mr. Holtschult testified that he was familiar with the IDOT Work Site Protection Manuel For Daylight Maintenance and Traffic Operations ("Work Site Protection Manual"). Respondent's Exhibit 9 is a copy of portions of the manual. Mr. Holtschult stated he had reviewed copies of the manual in safety meetings once a year. When asked if there was any moving operation shown in that manual as a standard that was a distance of 100 feet from the work area as a place to drive the sign truck, Mr. Holtschult responded, "No, not that I've seen in here." Mr. Holtschult testified that IDOT had signs available that could have been placed on trucks that indicate that the passing lane is closed ahead, but none were used that day.

Mr. Holtschult testified he had been involved in spraying operations for 13 years and the same procedure had always been used. He was not aware of any similar accidents occurring during those 13 years. He testified that it would take two to three hours to place stationary signs

warning of the spraying operation along the shoulder of the highway. He stated that he could not drive an International 3-ton truck like the nurse truck entirely on the shoulder and gravel of the median side of the interstate because it was too steep and that a pick up truck could not be driven on the shoulder and gravel without running it into the ditch. He also testified that he had previously driven a 3-ton truck similar to the nurse truck on the shoulder of the highway as a snowplow and had to drive in and out due to low shoulders.

Mr. Holtschult also testified that after the incident as he was going up toward the accident scene, a man came running over to him who stated, "I can't believe they hit you, I was right behind him, I could see them, you want me to stay around and give the police a report?" This statement was admitted over objection pursuant to the "excited utterance" exception to the hearsay rule. However, given that no other testimony was presented regarding the maker of the statement or the position of his vehicle behind the Todd van or how long before the accident his vehicle had been behind the Todd van, this statement lacks sufficient weight to be allowed to affect the outcome of this claim.

J. W. Todd testified that on the morning of June 2, 1988, he and Mrs. Todd left their home to go to their son's home in Cortland, Illinois. As he and Mrs. Todd approached the Princeton exit on I-80, they were passed by a semi-truck which continued to drive in the eastbound passing lane. They briefly discussed whether they should stop for lunch in Princeton, but decided to continue their journey. As Mr. Todd drove past the Princeton entrance ramp he noticed a second semi-truck attempting to enter eastbound I-80. He moved to the passing lane to allow the truck to enter the highway and drove the van back

into the driving lane after safely passing the truck. Mr. Todd testified that as he executed this maneuver the first semi-truck that passed him prior to the Princeton exit was in front of the van in the passing lane. After Mr. Todd returned to the driving lane he noticed what he thought was a pick-up truck driving through the median turn-around of I-80 which turned eastbound and disappeared ahead of the first semi-truck. Mr. Todd testified that the first semi-truck then veered into the driving lane. Mr. Todd estimated that the distance between the van and the semi-truck when the truck veered at him was 30 to 50 feet. Mr. Todd testified he was traveling around 60 miles per hour at the time and started to apply the brakes to slow the van down. According to Mr. Todd, his choices were either to rear end the semi-truck, pass the truck on the right or pass the truck on the left. He decided to pass on the left. He testified that he checked his rear view mirror, signaled, and moved to the passing lane. When he moved to the passing lane he noticed something in front of him about halfway over into the passing lane. He then eased the van over toward the semi-truck in an attempt to avoid a collision with the object in front of him. He had gone about 2/3 to 3/4 of the way past the semi-truck when the van impacted the arrow board trailer. Mr. Todd testified he did not see the arrow board, did not see the spray truck, and did not know what he had collided with until he was informed of the collision after he was hospitalized.

Dorothy Todd testified that she was riding in the front passenger seat in the van being driven by Mr. Todd. She testified that as she was reading a book immediately prior to the accident her attention was distracted when she observed the side of a semi-trailer and her passenger side window. She thought that the truck was awfully close to their van, but she did not look forward and resumed reading. The accident occurred within seconds after she

resumed reading. Mrs. Todd testified she didn't notice Mr. Todd swerve or abruptly change lanes or apply brakes before she noticed the semi-truck. She further testified that she did not remember a semi-truck pulling in front of the van from the passing lane. She also did not see the flashing arrow board directing traffic to the right or any of the revolving lights or emergency flashers in operation on the IDOT vehicles.

David Allison testified he observed the collision between the Todd van and the IDOT vehicles as he was traveling in the driving lane of westbound I-80. He stated he was approximately a sixteenth of a mile away when he first noticed the Todd van which was entirely in the passing lane and just behind the truck pulling the arrow board at the time of the impact. At the time of impact, Mr. Allison's vehicle was directly across the median from the spray truck. Mr. Allison testified that the van caught the corner of the arrow board trailer, slid along the sign truck and impacted the back of the spray truck. He did not recall seeing a semi-truck in the driving lane of eastbound I-80, but indicated it was possible that his attention was directed toward the accident and that he missed seeing a semi-truck in the driving lane. Mr. Allison also indicated it was possible for a semi-truck in the driving lane to proceed on down the road and not stop at the accident.

Earlier in the day, Mr. Allison passed the spray operation while he was traveling eastbound in the driving lane of I-80. He testified that while he passed the spray operation a semi-truck remained in the passing lane of I-80, resulting in his vehicle, the semi-truck, and the truck pulling the arrow board being parallel at the same time.

Allen Boseneiler, an IDOT investigator who investigated the accident, testified that the nature of the highway from the Princeton exit to the point of initial impact

18

was generally flat with a gradual sweeping curve. He indicated that only on careful observation would he be able to notice an incline in the highway if he was standing at the Princeton exit and looking east toward a median turnaround that was west of the accident scene. He testified that the median was approximately 55 feet wide from the inside shoulder to the opposite lane with normal slopes and the only vegetation being grass. According to Mr. Boseneiler, the lanes of the interstate were 21.8-feet wide with shoulders approximately 5-feet wide on the inside and approximately 8-feet wide on the outside. Mr. Boseneiler testified he did not find any skid marks that pertained to the accident.

Illinois State Trooper Joseph Fiorini was called to investigate the accident on June 2, 1988. He testified that when he arrived at the accident scene the IDOT vehicles were completely off the travel portion of the highway. According to Trooper Fiorini, the road character at the area of the accident was a gradual curve to the right, the road surface was dry, and there weren't any skid marks in the area. He attributed the cause of the accident to driver inattention and improper lane usage on the part of Mr. Todd. He did not, however, speak with Mr. or Mrs. Todd as part of his investigation of the accident.

Dr. Roland Ruhl testified through an evidence deposition and in Claimant's rebuttal as an expert witness for Claimant. Dr. Ruhl has an undergraduate degree in mechanical engineering, a master's degree in business and a doctorate degree in mechanical systems and design from Cornell University in Ithaca, New York. He has been a registered engineer in Illinois for over 25 years and has taught in the Department of Engineering at the University of Illinois on a full or part time basis since 1970. Dr. Ruhl also owns and operates Ruhl and Associates–Forensic, Inc.

with offices in Champaign, Illinois and Phoenix, Arizona. According to Dr. Ruhl's curriculum *vitae*, one type of service provided by Ruhl and Associates is to investigate and reconstruct vehicular accidents and provide expert testimony in litigation. He has previously been hired to work on cases by the State of Illinois as well as municipal governments. Dr. Ruhl has also previously been asked to testify on issues affecting roadway safety in design by the Illinois legislature.

In regard to this claim, Dr. Ruhl reviewed: the Illinois State Police accident report; a motorist report of the vehicle accident by Mr. Todd or submitted by someone on his behalf; weather data at the time of the accident; various standards that would be applicable at the time of the accident such as standard 2305 from the State of Illinois design manual; the IDOT Work Site Protection Manual; a training manual from American Traffic Safety Surfaces on Training Courses for Work Site Traffic Supervisor; the depositions of Claimants, James Galle, Larry Galle, Mark Holtschult and David Allison; information gathered by a colleague who is a certified accident reconstructionist who investigated the accident scene.

Dr. Ruhl testified in his evidence deposition that the accident was the result of the interaction of the Todd van, the semi-truck, which was traveling in the passing lane according to Mr. Todd, and the IDOT vehicles involved in the spray operation. According to Dr. Ruhl, the encroachment into the passing lane by the spray operation closed the passing lane. The only person in a position to see the spray operation was the driver of the semi-truck. When the same truck moved swiftly into the driving lane and braked heavily, Mr. Todd determined that he needed to pass the semi-truck rather than brake to avoid colliding with it. Dr. Ruhl stated, "Generally speaking, we can out-turn a fixed

object better than we can brake, particularly at highway speeds." Dr. Ruhl testified that after Mr. Todd maneuvered into the passing lane the van first struck the right side of the sign trailer and the International truck which essentially peeled off the left side of the Todd van. The van then continued forward and struck the right rear of the spray truck.

According to Dr. Ruhl, the closing of the passing lane created certain obligations to comply with custom and practice as well as the state manual to make sure that the traveling public on a daytime moving operation has the proper warning. In Dr. Ruhl's opinion, the accident occurred because Mr. Todd did not have adequate notice of the spray operation.

He testified that, in an attempt to protect both the traveling public and the workers, it was necessary to implement a plan that has at its very core enough time and information to the public in such a way that they can digest and use it in an orderly fashion, so they are not confronted with an unexpected situation at the last minute. He testified that pages 50 and 51 of the IDOT Work Site Manual would need to be followed. If the spray operation could have been conducted entirely on the shoulder and gravel without encroachment into the passing lane, two trucks could have been used if they would have maintained a separation distance of 1,000 feet. If the operation was encroaching on the passing lane, resulting in a lane closure, the distance between the two trucks should be 1,500 feet and the rear truck should be off the highway. In Dr. Ruhl's opinion, the encroachment into the passing lane by the IDOT vehicles and the close space between them did not comport with custom and practice for a moving operation on a freeway. According to Dr. Ruhl, Mr. Todd was prevented from getting the information he needed when he needed it. He indicated that if there had

been a second warning truck 1,500 feet behind the arrow sign Mr. Todd wouldn't have been constantly blocked by the semi-truck and would have had advanced warning that he should not have passed the semi-truck.

Robert Seyfried was called by Respondent as an expert witness. He is a licensed professional engineer with bachelor and masters degrees in civil engineering from Northwestern University who is employed by the Traffic Institute at Northwestern University. The Traffic Institute provides continuing education classes and workshops to professionals in the field of traffic and transportation. Mr. Seyfried is on the National Committee on Uniform Traffic Control Devices and is a member of the Institute of Transportation Engineers. He is also a certified accident reconstructionist. Information Mr. Seyfried reviewed regarding this claim included: the Illinois State Police Accident Report; approximately 145 photographs of the accident site and vehicles involved in the accident; transcripts of witness statements; hand written statements; the IDOT Work Site Protection Manual; the IDOT Manual on Uniform Traffic Control Devices ("Traffic Control Devices Manual"); the depositions of Claimants and Dr. Ruhl.

According to Mr. Seyfried, the operation that was occurring on the day of the accident amounted to two IDOT trucks traveling along eastbound I-80, one ahead of the other. The spray truck was in the lead with a nurse truck about 100 feet behind. The spray truck was spraying herbicide on weeds on the gravel shoulder along the left-hand side of the highway. The nurse truck was pulling a trailer upon which a Type C arrow board was mounted. A Type C arrow board is 48 inches by 96 inches. Mr. Seyfried indicated that the Type C arrow board is the largest used and according to the Traffic Control Devices Manual, portions of which are contained in Respondent's Exhibit 36, has to

be bright enough to be visible under bright daylight conditions for a distance of at least a mile. Mr. Seyfried testified that a highway lane is either open or closed and that because the IDOT vehicles had to be in the passing lane the IDOT workers were using arrow boards to close the lane.

Mr. Seyfried testified that he had reviewed the IDOT Work Site Protection Manual and that, in general, its purpose is to provide guidance to IDOT employees that are performing maintenance activities on the roadway in terms of traffic control that is desirable for those types of activities. In his opinion, the purpose of the manual was not to address or be applicable to every maintenance and traffic operation performed during the day. He stated the manual provides a general guide and illustrations that are specific to very specific conditions, but it requires a lot of interpretation as applied to site conditions or operations that are different than what is specifically diagrammed in the manual. Mr. Seyfried further testified that the Purpose Section of the manual stated that requirements concerning special placement of traffic control devices should be referred to workers' immediate supervisor. Mr. Seyfried also testified that Part 6 of the Traffic Control Devices Manual, applied to the spraying operation. He specifically referred to a portion of Section 6B-4 which states:

"For maximum mobility on certain types of maintenance operations, a large sign may be effectively mounted on a vehicle stationed in advance of the work or moving along with it. This may be the working vehicle itself as in the case of shoulder mowing or pavement marking equipment or a vehicle provided expressly for this purpose. These mobile sign displays may be mounted on a trailer, may be provided with self-contained electric power units with flashers and lights, or may be mounted on a regular maintenance vehicle."

According to Mr. Seyfried the spraying operation was being conducted exactly as provided in the preceding portion of Section 6B-4.

Mr. Seyfried also testified that in his opinion a portion of Section 6E-7 also applied to the spraying operation which states:

"Arrow panels are effective in encouraging drivers to leave the closed lane sooner. Arrow panels provide additional advance warning and directional information where traffic must be shifted laterally along the roadway."

Another portion of Section 6E-7 which Mr. Seyfried stated applied to the spraying operation states:

"Arrow panels are generally used for day or night closures, roadway diversions, and slow moving maintenance and construction activities on the traveled way."

According to Mr. Seyfried, the arrow board is probably one of the best traffic control devices available for use in construction or maintenance zones.

Mr. Seyfried also testified that a portion of Section 6E-8 of the Traffic Control Devices Manual applied to the spraying operation which states:

"For moving-maintenance activities where a lane is closed, it is preferable that the arrow panel be placed at the rear of the activity in the closed lane on a vehicle separate from the maintenance vehicle itself. The arrow panel should always remain upstream of the maintenance vehicle where adequate recognition distance is available."

Mr. Seyfried testified that the diagrams on pages 50 and 51 of the IDOT Work Site Protection Manual came the closest to pertaining to the spray operation, but neither one of them was directly applicable in the sense that they both represented roadway conditions different than was actually present at the site. According to Mr. Seyfried, the diagram on page 50 which shows a moving operation one-lane closure using a flashing arrow board was different in the following three ways: (1) The diagram shows a shoulder at least eight-feet wide that would allow the shadow truck to be completely over on the shoulder, whereas at the location of the accident in this claim the shoulder was not wide enough to fully shadow either of

the trucks; (2) The work area in the diagram was fully within the lane of traffic, whereas in this claim the truck was only partially into the lane as the result of the work that was being performed; (3) The work area in the diagram is completely ahead of the truck and the employee would actually have to get out of the truck to do work on the roadway so the right-hand truck is being used to shield the workers.

Mr. Seyfried testified that there were the following two differences between the diagram on page 51 which shows a moving operation conducting shoulder work and the situation in this claim: (1) The diagram shows a shoulder width wide enough to allow the trucks to be fully on the shoulder as opposed to partly in the lane; (2) The diagram shows a work area ahead of the right-hand truck which would require the workers to get out of the truck to perform work on the pavement or the shoulder ahead of the second truck, rather than a continuously moving operation that was being conducted in this claim.

In Mr. Seyfried's opinion, it would not have been appropriate in the situation in this claim to have had permanently placed signs indicating a lane closure or shoulder work ahead because the spray operation moved continuously down the roadway and stationary signs would become nonfunctional as the operation moved further down the road thereby causing drivers to forget the warning existed. Mr. Seyfried also testified that the 1,500 foot distance shown in the diagram on page 50 and the 1,000 foot distance shown in the diagram on page 51 pertained to distances that provide advanced warning for drivers of the work ahead. He noted that the difference between the diagrams and this case is that the diagrams show the first truck entirely on the shoulder and that drivers do not have to take any action until they pass the first truck,

whereas in this claim the drivers had to take action before they ever got to the first truck because the first truck had to be partly in the left lane. He indicated that once that happened any separation between the two trucks is not beneficial and too much separation would be a negative factor.

After reviewing Respondent's Exhibit 34, which is an aerial photo of the section of I-80 that is pertinent to this claim, Mr. Seyfried testified that the section of roadway is on a long, flat horizontal curve to the right. He stated if a driver is in the right lane in this area and needs to be able to see the arrow board which is on the left side of the roadway up ahead, the fact that the road curves to the right actually improves the driver's visibility. He further stated that any vehicle to the left of the left-hand lane would be out of the way of the driver and throughout most of this section of roadway the driver would have a clear line of sight of that arrow board. Mr. Seyfried also testified that the grade of the roadway would have had no effect on Mr. Todd's ability to see the arrow truck.

On cross-examination, Mr. Seyfried, after being asked again to review pages 50 and 51 of the Work Site Protection Manual, indicated that the sign on the truck at the rear of the operation on page 50 indicated lane closed ahead and the arrow board sign was at the rear of the work area. He testified that there was no need for having a "lane closed ahead" sign in this claim and there was no practical way it could be done. When asked whether another vehicle could have been used to display a lane closed sign, Mr. Seyfried testified that a third vehicle could not have been used since that vehicle would also have had to drive in the closed lane because it could not drive on the shoulder in the gravel due to the gravel having just been sprayed. Mr. Seyfried further testified that

at the most a truck could travel 3 feet into the roadway because the shoulder was only 4½ to 5 feet wide. When asked to review Trooper Fiorini's report indicating a 4 foot wide gravel area and a 4 foot, 6 inch shoulder, he again stated that the truck would not be able to travel on the gravel shoulder because it had just been sprayed. When asked whether he had anything to back up his feeling that the spraying would be disrupted he indicated that he did not except for his experience in spraying herbicide on his driveway.

In rebuttal testimony Claimant's expert, Dr. Ruhl was asked to review Respondent's Exhibit 34, the aerial photo of I-80. He testified that the exhibit indicated, assuming no vehicle obstruction, a line of sight of about 2,800 feet to the initial point of impact. However, according to Dr. Ruhl people are not expected to look that far ahead and most truck drivers are trained to look 1,100 to 1,200 feet. Dr. Ruhl indicated that the area where Mr. Todd needed information assuming no vehicle obstruction, would be 1,300 to 1,500 feet prior to the initial point of impact. Dr. Ruhl testified that it was feasible if Mr. Todd was proceeding in the right lane of traffic with a semi-truck in front of him in the left lane of traffic, his vision of the arrow board sign would have been blocked from 1,500 feet to the initial point of impact. Dr. Ruhl also testified that the Traffic Control Device Manual provides that arrow panels are intended to supplement other traffic control devices. He quoted a portion of section 6E-7 of the manual that states,

"Arrow panels will not solve difficult traffic problems by themselves but they can be very effective when properly used to reinforce signs, barricades, or other traffic control devices."

Dr. Ruhl further testified that he disagreed with Mr. Seyfried that no other signs were needed to warn the motorist of the work area other than the arrow board. He

noted that warning distances in the Work Site Protection Manual were 1,000 feet or more and were never as short as 100 feet. He indicated that whether a stationary sign or moving truck is used as a warning device, the first notice to the traveling public needs to be in the range of 1,000 to 1,500 feet. Dr. Ruhl disagreed with Mr. Seyfried's assertion that it was impossible to have a sign mounted on a moving truck that was traveling down the shoulder and graveled area of I-80 on the median side of the road. He indicated that the International and Sierra trucks are typical vehicles that are used on construction sites and the facts that it might have been rough and there might have been a drop-off on the edge of the gravel towards the median would not create a problem for a warning vehicle. According to Dr. Ruhl, even if the drop-off did create a problem the solution is not to do nothing but to provide some alternative method to alert people. Dr. Ruhl acknowledged that the arrow board is a great device, but in the situation in this claim the arrow board was being pulled by a truck which was essentially protecting the work site and not providing protection for the driving public. He stated that what was missing was another truck warning motorists 1,000 to 1,500 feet further up the road to provide advance warning.

On page 2 of the IDOT Work Site Protection Manual is the statement, "Proper placement of traffic control devices is required for protection of the workers, the traveling public, and the work area." Claimants argue in their brief that this creates a duty on the part of Respondent in conducting maintenance operations to properly place traffic control devices for the protection of the workers, the traveling public, and the work area. Claimants contend that Respondent breached its duty to them in three ways.

Claimants first contend that the slow-moving IDOT vehicles which were encroaching on the passing lane of I-80, which had a posted maximum speed of 65 miles per hour and minimum speed of 45 miles per hour, required the complete closure of the passing lane both prior to and along the maintenance operation. Claimants note that the IDOT vehicles constituted a violation of driver expectancy, as did the abrupt narrowing of the portion of I-80 which remained open to the public. Claimants assert Respondent failed to clearly communicate the lane closure to the public and failed to use a method that would unequivocally guide the public safely around the obstacle. In support of their contention Claimants cite the testimony of Respondent's own expert, Mr. Seyfried, who stated the encroachment of the IDOT vehicles required the closure of the passing lane. However, uncontradicted testimony indicated there were no stationary warning signs along the side of the highway prior to the moving operation or signs on the IDOT vehicles which clearly advised the public that the lane was closed.

The second contention in Claimant's brief is that Respondent breached its duty to Claimants in that Respondent failed to properly warn the traveling public of the presence of the sign truck and arrow board trailer, which was being used as a warning device. Claimants refer to page 50 of the IDOT Work Site Manual, which indicates that the arrow board vehicle becomes a part of the work site being protected when the vehicle is traveling in the lane of traffic. Page 50 also shows an additional vehicle 1,500 feet behind the arrow board vehicle. Claimants again note that Respondent's expert opined that the encroachment by the IDOT vehicles required closure of the passing lane, yet there was no advance warning of the obstruction caused by the sign truck and arrow board trailer.

Claimants assert that while the arrow board, if timely observed, does direct the oncoming traffic toward the right lane of traffic, it does not alert the public to the fact that the passing lane was closed or that Respondent's vehicles were traveling at a dangerously slow rate of speed in the passing lane. Claimants further assert that the arrow board is designed to supplement other traffic control devices, but was being solely relied upon to close the lane. According to Claimants, additional warning devices, either stationary or moving, should have been utilized at least 1,500 feet prior to the truck carrying the arrow board to give adequate warning to Claimant.

The third contention in Claimant's brief that Respondent breached its duty to Claimants is that Respondent's employees, by following the instructions of the IDOT engineer in charge, performed the function of protecting the workers, but ignored the function of giving adequate notice to the public by having the sign truck follow the spray truck with only 90 to 125 feet of separation between the two vehicles. Again referring to page 50 of the IDOT Work Site Protection Manual, Claimants assert that Respondent should have started the warning function from a position entirely off the highway, at least 1,500 feet prior to having any IDOT vehicle or equipment encroach into the passing lane. Claimants note that testimony indicated that IDOT had an adequate provision of signs that could have informed the traveling public that the passing lane was closed. Claimants assert that if Richard Bussan, the engineer supervising the employees, wanted to have the sign truck act as a block to prevent traffic from cutting back in and hitting the spray truck, he could have designed a moving operation using a "lane closed ahead" sign on the back of a third truck which could have traveled entirely on the shoulder and

gravel 1,500 feet behind the nurse truck towing the arrow board. According to Claimants, the net result of such an operation would have given all approaching vehicles adequate warning to allow them to merge safely into the driving lane of traffic before encountering the IDOT vehicles encroaching in the passing lane.

Respondent in its brief agrees that it owes a duty to properly place traffic control devices during highway maintenance operations for the safety of workers and the traveling public. Respondent contends that it fulfilled its duty for the following reasons.

Respondent contends that, even though the IDOT vehicles were in a portion of the passing lane, it did not have a duty to warn the public of the slow moving vehicles with signage other than what was being used by the IDOT vehicles. Respondent notes admission by Claimants in their brief that the arrow board, if timely observed, does direct the approaching traffic toward the right lane. Respondent refers to the testimony of its employees that they had not encountered any similar close calls on the day of the accident or the previous day. Respondent further refers to the testimony of Mark Holtschult that in his 13 years of spraying experience he had never been in another accident. Respondent questions whether Mr. Todd could have seen other signs if he was unable to see the arrow board sign which had a visibility of one mile.

Respondent contends in its brief that Claimant's attempt to equate the spray operation with the diagrams on pages 50 and 51 of the IDOT Work Site Protection Manual is unpersuasive. Respondent notes that diagrams in the manual are not exhaustive and nowhere in the manual is there an example of the spray operation. Respondent asserts that these diagrams do not apply because the manual

shows an operation on the right hand shoulder whereas the spray operation was being conducted on the left shoulder. Respondent also asserts the diagrams do not apply because the examples show work being performed in front of the lead truck, whereas the work being conducted in the spray operation was performed by the lead truck. Respondent further asserts that the examples in the diagram show three lanes of highway instead of the two lanes that were present during the spray operation.

Respondent also contends in their brief that it was impractical to place signage on the highway indicating the spray operation because it was a moving operation. According to Respondent, as the spray operation moved down the highway, the signage would either have become ineffective or have required constant repositioning. Respondent further asserts that warning devices such as channelization that could have been used were problematic because they would have required it to close large sections of interstate down, possibly in sections of 25 or 50 miles in length.

Respondent further contends in its brief that it was necessary to have the distance between the spray truck and the arrow board truck as close as it was because the safety of the workers would have been defeated if a larger distance had been maintained. Respondent refers to testimony from IDOT employees and Mr. Seyfried that, if the trucks had been farther apart, traffic would have cut back in between the trucks, thus destroying the buffering effect of the arrow board truck.

Finally, Respondent contends in its brief that even assuming the existence of the semi-truck that passed Mr. Todd and swerved in front of him, there is no explanation in the record as to why Mr. Todd did not see the arrow board before the semi-truck passed him since the board

had a visibility of one mile. If the semi-truck did not exist, Respondent argues that Mr. Todd's argument of lack of warning evaporates.

It is undisputed that Respondent had a duty to properly place traffic control devices for the protection of the traveling public as well as its workers and the work area. At issue is whether the arrow board, the only traffic control device used by Respondent, was sufficient to warn the traveling public of the spray operation and safely guide the traveling public around the spray operation.

The record shows that the IDOT Work Site Protection Manual and the IDOT Traffic Control Devices Manual, are the documents that are relevant in determining whether the procedure utilized by Respondent was appropriate.

Page 2 of the IDOT Work Site Protection Manual states:

"The purpose of this booklet is to aid in placement of traffic control devices during maintenance and traffic operations performed by Department of Transportation personnel.

Proper placement of traffic control devices is required for protection of the workers, the traveling public, and the work area.

It is impossible to include illustrations to cover every situation which requires work area protection. The protection plans illustrated in this booklet are intended as typical examples for the placement of traffic control devices during DAYLIGHT maintenance and traffic operations. These illustrations were derived from the requirements of the 'Illinois Manual on Uniform Traffic Control Devices for Streets and Highways, Part 6.'

Nighttime work will utilize current highway standards as a minimum.

Requirements concerning special placement of traffic control devices should be referred to your immediate supervisor."

The Work Site Protection Manual does not contain any illustrations that would specifically cover the spray operation that was being conducted by Respondent. However, both Claimant's expert and Respondent's expert agreed that the closest illustrations are on pages 50 and

51. Another illustration that is similar to the operation that was being conducted is on pages 32 and 33. Since there was not a specific illustration in the Worksite Protection Manual to cover the spray operation, page 2 of the manual required IDOT's employees to seek directions from their immediate supervisor, engineer Richard Bussan. It was the responsibility of the supervising engineer to design a warning procedure with proper placement of traffic control devices for the protection of the traveling public. The supervising engineer instructed the employees to continue the spray operation as they had the previous day with the arrow board approximately 100 feet behind the spray truck being the only traffic control device utilized.

Section B-3 of the IDOT Traffic Control Devices Manual states, in relevant part,

"Signs shall be placed in positions where they will convey their messages most effectively and placement must therefore be accommodated to highway design and alignment. Signs shall be so placed that the driver will have adequate time for response.

\* \* \*

*Where open highway conditions prevail on the approach to the work site, advanced warning signs should be placed approximately 1,500 feet in advance of the condition to which they are calling attention. Where a series of advance warning signs are used, the warning sign nearest the work site should be placed approximately 500 feet from the point of restriction with the additional signs at 500-1000 foot intervals. On expressway and limited access facilities, the advance warning distance should be increased to one-half mile or more."* Emphasis added.

It is undisputed that Respondent was conducting the spray operation on an expressway with open highway conditions. Though Section B-3 required that advance warning signs should have been placed one-half mile or more in advance of the spray operation, Respondent's supervising engineer instructed the employees to use a warning procedure that did not do so.

Section 6E-7 of the IDOT Traffic Control Devices Manual states in relevant part:

"Advance warning arrow panels are sign panels with a matrix of lights capable of either flashing or sequential displays. *Advance Warning Arrow panels are intended to supplement other traffic control devices. Arrow panels will not solve difficult traffic problems by themselves, but they can be very effective when properly used to reinforce signs, barricades, cones, and other traffic control devices. Necessary signs, barricades, or other traffic control devices shall be used in conjunction with the advance warning arrow panel.*

Arrow panels are effective in encouraging drivers to leave the closed lane sooner. Arrow panels provide *additional* advance warning and directional information where traffic must be shifted laterally along the roadway. They assist in directing and controlling traffic around construction or maintenance activities being conducted on or adjacent to the traveled way and give drivers positive guidance about a roadway path diversion that they might not otherwise expect." Emphasis added.

It is undisputed that the arrow board panel which, placed approximately 100 feet in advance of the spray truck, was the only warning device that was being used to warn of the spray operation. Though Section 6E-7 clearly states that arrow panels are supplemental devices and that necessary signs, barricades, cones or other traffic control devices shall be used in conjunction with advance warning panels, Respondent's supervising engineer instructed the employees to use a warning procedure which relied solely on the arrow panel without the use of any other traffic control devices.

The illustrations in IDOT's Work Site Protection Manual, that are most similar to the spray operation that was being conducted, are those on pages 32 and 33 and the one on page 50. The illustration on pages 32 and 33 is for a multilane divided moving operation using flashing arrows on a rural highway with a speed limit of 45 miles per hour. The illustration portrays work being performed in the right lane of the highway. A truck carrying an arrow panel is a minimum of 100 feet behind the work area. Another truck carrying an arrow panel is on the highway

shoulder 600 feet behind the truck behind the work area. Additional stationary warning signs are placed behind this truck on both the shoulder and the median. A note above the illustration states that when work is being performed in the left lane, corresponding left lane information shall be used. This is the situation that occurred in this claim.

The illustration on page 50 is for a moving operation, one-lane closure using a flashing arrow on a freeway. This illustration portrays work being performed in the right lane of the expressway. A truck carrying an arrow panel is behind the work area. Another truck carrying a right lane closed ahead sign is traveling on the shoulder 1500 feet behind the truck behind the work area.

In both the aforementioned illustrations, additional advance warning devices, whether stationary or moving, are being provided behind the truck carrying the arrow panel that is behind the work area. These illustrations were available to Respondent's supervising engineer for guidance in designing the warning procedure for the spray operation. Though the illustrations call for additional warning devices in advance of the arrow panel behind the work area, Respondent's supervising engineer chose to use a warning procedure that did not use any additional warning devices. Respondent's argument that the illustration on page 50 is not applicable to the spray operation is not persuasive.

It is the opinion of this Court that by failing to adhere to the requirements of its own Traffic Control Devices Manual and the guidance of its own Worksite Protection Manual, Respondent was negligent in its own design and use of the warning procedure that was in place on the day of the accident. Respondent therefore breached its duty to properly place traffic control devices to sufficiently warn the traveling public of the spray operation.

Respondent's expert testified that the intent of IDOT's workers was to close the passing lane. Respondent maintains that it could not have used a warning procedure using stationary warning devices to warn of the lane closure because large portions of highway would have had to have been closed. While it may be true that it was necessary for large portions of the passing lane of the highway to be closed, this does not relieve Respondent from designing and using a warning procedure in accordance with its own Traffic Control Devices Manual and guided by its own Work Site Protection Manual. Further, if proper warning of the spray operation required large portions of the highway to be closed, Respondent should have done so.

Respondent also maintains that it could not have used a warning procedure using a truck displaying a lane closed ahead sign traveling on the median shoulder behind the spray operation because the median was not wide enough and the shoulder was too steep. This also does not relieve Respondent from designing and using a warning procedure in accordance with the requirements of its own Traffic Control Devices Manual and guided by its own Work Site Protection Manual. Further, Respondent's Exhibit 8, the police report prepared by Respondent's witness, Trooper Fiorini, indicates that the paved portion of the median shoulder was 4½ feet wide and the gravel portion of the median shoulder was approximately 4 feet wide, a combined distance of approximately 8½ feet. Respondent's witness, Larry Galle, testified that the nurse truck being driven by Respondent's witness Mark Holtschult, an International 3 ton truck, was 8 to 8½ feet wide. It therefore appears from the testimony of Respondent's own witness that it may have been possible that the International 3 ton truck being driven by Mr. Holtschult could have been driven on the paved and gravel portions

of the median shoulder. Mr. Holtschult testified that he could not drive an International 3-ton truck entirely on the paved shoulder and gravel portion of the median because it was too steep. Respondent's own witness, Allen Boseneiler, testified that the median had normal slopes and Mr. Holtschult testified he had previously driven a 3-ton truck similar to an International 3-ton truck on the shoulder of the highway as a snow plow and had to drive in and out due to the low shoulders. Respondent's photograph exhibits of the accident scene do not show terrain that would have been difficult for an International 3-ton truck traveling 5 to 10 mph to traverse. Even assuming that an International 3-ton truck was too large to drive on the paved and gravel portions of the shoulder, there does not appear to be any reason that a smaller pickup could not have been used to carry a sign indicating a lane closure. The testimony of Respondent's expert, Dr. Seyfried, that a warning truck could not have been driven on the gravel portion of the median shoulder because it would have disrupted the spraying that had just been done is unpersuasive. In any event, if Respondent's supervising engineer determined that the conditions prevented using an additional warning truck traveling on the median shoulder behind the arrow board truck, he should have designed a warning procedure using stationary warning devices in accordance with the requirements of the Traffic Control Devices Manual and under the guidance of the Work Site Protection Manual.

In order to prevail, Claimants must prove by a preponderance of the evidence that Respondent breached its duty and that the breach proximately caused the injuries to Claimants. (See *Harry W. Kuhn Redi-Mix Concrete v. State* (1993), 45 Ill. Ct. Cl. 33, 41.) Proximate cause is any cause which, in natural or proper sequence, produced the

injury complained of. It need not be the only cause or the last or the nearest cause. It is sufficient if it concurs with some other cause acting at the same time, which in combination with it, causes the injury. (Definition adopted by Court from Illinois Pattern Jury Instructions.) See *Smith v. State* (1989), 42 Ill. Ct. Cl. 19, 24.

Having found that Respondent breached its duty to properly place traffic control devices to sufficiently warn the traveling public of the spray operation and safely guide the traveling public around the spray operation, it is next necessary to determine whether Respondent's breach was the proximate cause of the accident. The testimony conflicts regarding the existence of the semi-truck which Mr. Todd maintains obscured his vision of the arrow board, swerved in front of him, and forced him to pass and strike the IDOT vehicles. Mr. Todd testified to the existence and actions of the semi-truck. Mrs. Todd testified that she saw the truck out of the passenger side window. Respondent's witness, James Galle, testified that he did not notice the truck and that he did not see the Todd van. Respondent's witness, Mark Holtschult, testified he did not see any vehicle other than the Todd van remain in the passing lane of traffic. Respondent's witness, David Allison, testified he did not recall seeing a truck in the driving lane, but acknowledged that it was possible his attention was directed toward the accident and that he could have missed a truck in the driving lane. The Court finds the Todds to be credible witnesses and is persuaded by their testimony that the semi-truck did exist. The Court is also persuaded that the accident happened according to the testimony of Mr. Todd. It is the opinion of this Court that Respondent's breach of failing to properly place traffic control devices to sufficiently warn of the spray operation was a proximate cause of the

accident. Respondent's breach caused Mr. Todd to not be sufficiently warned of the spray operation. Respondent's breach also created the situation which contributed to the semi-truck swerving abruptly in front of Mr. Todd. Additional advance warning of the spray operation would have provided vehicles in the passing lane more time to switch lanes. It is arguable that the driver of the semi-truck may have been negligent in the manner used to switch lanes but, as stated earlier, proximate cause need not be the only cause or the last cause or the nearest cause. It is sufficient if it occurs with some other cause at the same time, which in combination with it, causes the injury. Respondent's failure to properly place traffic control devices to sufficiently warn of the spray operation was a proximate cause of the accident in this claim and Respondent is therefore liable for the injuries that resulted therefrom.

Respondent argues that comparative negligence should be considered to either prevent Claimants from recovering or to reduce the amount of their recovery. However, the Court has determined that Mr. Todd's comparative negligence shall not be considered due to Respondent's failure to show good cause for failing to timely file its affirmative defenses regarding Mr. Todd's alleged comparative negligence.

Mr. Todd suffered severe injuries as the result of the accident. His testimony, medical records, and the evidence deposition of Dr. Jeffrey Traina, one of his treating physicians, reveals as follows.

Initial x-rays of Mr. Todd showed a compound fracture of the cervical spine at C-7 with a dislocation of the first rib. He also had a deep laceration to his left elbow. Mr. Todd bled severely from his wounds, requiring transfusions of fluid and red blood cells at Perry Memorial Hospital in Princeton, Illinois and St. Francis Hospital in

Peoria, Illinois. After a helicopter transfer to St. Francis Hospital he underwent surgery on the date of the accident for irrigation and debridement of the open tibia and fibula fracture of the right leg with application of an external fixator, irrigation and debridement of open fractures to the supracondylar area of left femur and patella, with application of a Steinmann tibial traction pin, irrigation and debridement of the laceration to the chest, irrigation and debridement of the laceration to the left elbow joint and the left radical head fracture, and irrigation and debridement of the index finger and the long finger metacarpophalangeal joint on the left hand. On June 4, 1988, Mr. Todd underwent a second surgery, including dressing changes, irrigation and debridement of the left distal femur fracture, irrigation and debridement of the left open elbow fracture, irrigation and debridement and repair of the extensor tendons to the left index and long fingers. On June 9, 1988, Mr. Todd underwent a third surgery for closure of the right tibial wound, closure of the left elbow wound and irrigation and debridement of the left femur. He was discharged from St. Francis Hospital on June 21, 1988 and transferred to St. Luke's Hospital in Davenport, Iowa, under the care of Dr. Kreiter. During his stay at St. Francis Hospital, Mr. Todd was in traction for 20 days.

At St. Luke's Hospital, it was determined that Mr. Todd had developed a deep infection of the left knee fracture. He was placed in traction, underwent a surgical procedure for debridement of the wound and a split thickness skin graft was harvested from his right thigh and grafted over his left knee. A 2 centimeter by 2 centimeter fragment of the left knee patella was also removed. He was discharged from St. Luke's Hospital on August 11, 1988, in a right-leg walking cast and with left-leg cast brace. During his stay at St. Luke's Hospital, Mr. Todd was in traction for 50 days.

Mr. Todd next underwent a surgery by Dr. Traina at St. Francis Medical Center on December 12, 1988 for an intramedullary nail insertion into the right tibial fracture. He was hospitalized from December 11, 1988 through December 20, 1988. On December 16, 1988, Mr. Todd underwent a series of four stellate ganglion blocks for left neck, shoulder and face numbness, but this did not resolve the problem.

Mr. Todd was next evaluated at the Mayo Clinic on October 23, 1989. He was found to have C-2 through 4 left-sided cervical paresthesias, possible nonunion of the right tibia fracture, and severe disruption of the left knee with nonunion of the left lateral femoral condyle. On December 15, 1989, Mr. Todd underwent a surgical procedure at the Mayo Clinic to his right leg to remove the nail previously inserted by Dr. Traina in the tibia, remove a portion of bone from the fibula to shorten it, and reinsert a shorter intramedullary nail in the tibia. He was discharged in a cast on December 21, 1989.

On February 1, 1990, Mr. Todd underwent another surgery at the Mayo Clinic to his left lateral femoral condyle for nonunion of the fracture. Dr. D. G. Lewallen used internal fixation with a plate and 15 screws with transplantation of an autogenous illiac bone graft to the left femur. Mr. Todd was discharged from the hospital on February 11, 1990. He was seen at the Mayo Clinic over the course of the next four months for various cast changes until union of his right and left-leg fractures was achieved. Mr. Todd was still on crutches in June, 1990, over two years after the date of the accident.

Mr. Todd was seen by Dr. Traina for evaluation on October 22, 1997. At the time, Claimant was using a cane for support. He had pain in the mid-shaft of the right tibia, with atrophy of the muscles of the right leg. X-rays

showed the right tibia fracture to be united. Mr. Todd had significant scarring of the left leg and atrophy of the muscles of the left leg. The range of motion of the left knee was from 0 to 75 degrees. He was experiencing pain on occasion in the left leg and knee. X-rays of the left leg show the fracture to be united, but he had degenerative joint disease of the left knee. Mr. Todd had a limited range of motion of his right ankle approximately twenty degrees from normal. Mr. Todd complained of continued numbness of the left side of the face and neck, which Dr. Traina deemed to be permanent.

Dr. Traina testified in his evidence deposition that the multiple fractures sustained by Mr. Todd were painful, that he was placed into traction for those fractures and placed on narcotic pain medication. Dr. Traina further testified that the three surgical procedures that Todd underwent while at St. Francis were painful and that any movement of Mr. Todd's hospital bed caused additional pain.

Dr. Traina testified that within a reasonable degree of medical certainty, the collision of June 2, 1988 caused Mr. Todd's injuries, and that those injuries caused Mr. Todd serious and permanent disfigurement and disability. Dr. Traina further testified that the injuries were likely to cause future pain and suffering, and that future medical treatment will be required to alleviate the effects of the injuries sustained in the collision. Specifically, Dr. Traina was of the opinion, within a reasonable degree of medical certainty, that J. W. Todd would need a total left-knee replacement.

Mr. Todd testified that he has to wear a left shoe that is built up 2 inches due to shortening of his left leg. The plate and screws surgically implanted in his left leg at Mayo Clinic are still present, as is the rod implanted in his right leg.

Mr. Todd introduced past medical bills for injuries sustained in the accident totaling $111,940.06. He was hospitalized for a total of 106 days during the period from June 2, 1988 through the completion of his treatment at Mayo Clinic on February 11, 1990. He has sustained severe pain and suffering and serious permanent disfigurement. He will continue to have pain and future medical expenses. It is the opinion of the Court that he should be awarded $400,000 as damages for the personal injuries he suffered as a result of Respondent's negligence.

Mrs. Todd suffered severe injuries as the result of the accident. Her testimony, medical records, and the evidence deposition of Dr. Jeffrey Traina, one of her treating physicians, reveals as follows.

Initial x-rays of Mrs. Todd revealed that she sustained a left tibial plateau fracture, a fracture of the left femur, multiple fractures of the left tibia and fibula and a fracture of the left maxillary sinus. She received a transfusion of blood and was transported to St. Francis Hospital by helicopter.

At St. Francis Hospital Mrs. Todd came under the care of Dr. Traina. On June 2, 1988, a surgery was performed in which Dr. Traina attempted unsuccessfully to reduce the femoral neck fracture. He also performed an irrigation and debridement of the commuted fractures of the left tibia and fibula. On June 8, 1988, Mrs. Todd was again taken to surgery where a metal rod was implanted to stabilize her tibial fractures. The femoral head was also removed and an artificial ball was inserted. She was discharged from St. Francis Hospital on June 21, 1988.

Mrs. Todd next came under the care of Dr. Richard Kreiter, who monitored the fractures and placed her in various casts. On October 23, 1989, Mrs. Todd was evaluated at the Mayo Clinic due to continuing complaints of

her left hip and left leg pain, with x-rays showing a non-union fracture of the upper shaft of the left tibia, and a diagnosis of left trochanteric bursitis. Mrs. Todd underwent surgery at the Mayo Clinic on November 3, 1989. During the procedure, the intramedullary rod previously inserted at St. Francis Hospital was removed and an excision was made of a one centimeter portion of her tibula. An intramedullary rod was then reinserted in the tibia. Mrs. Todd was discharged on November 8, 1989, and returned on several occasions for cast removal and reapplication. Her tibial fracture progressed to a complete union.

On November 7, 1997, Mrs. Todd was seen by Dr. Traina. He testified in his evidence deposition that at that time Mrs. Todd had a one-half inch leg length discrepancy of her left leg, had some weakness by her left hip, and had developed a limp with prolonged walking. She also had pain over the fracture site of the left tibia and pain in the area of the trochanteric bursa of her left hip. Dr. Traina testified that within a reasonable degree of medical certainty, Mrs. Todd's injuries were caused by the automobile accident of June 2, 1988, that the injuries caused her pain and suffering that will continue in the future, and that Mrs. Todd had suffered serious and permanent disfigurement. Dr. Traina further testified that it is possible that the intramedullary rod that was inserted in Mrs. Todd's left tibia may have to be removed or replaced in the future. He also testified that it is possible she may have to undergo total left hip replacement in the future. Mrs. Todd introduced medical bills for the injuries sustained in the accident totaling $42,588.48. She has sustained serious and permanent injuries, pain and suffering, and will experience future pain and suffering. It is the opinion of this Court that she should be awarded $300,000 as damages for the personal injuries suffered as the result of Respondent's negligence.

At the time of the accident, Mr. and Mrs. Todd had been married for 41 years and retired for one year. They testified that they had plans to travel using a camper they owned and had already enjoyed trips to Arkansas and Missouri subsequent to their retirement. Mr. and Mrs. Todd testified as having a normal sexual relationship prior to the accident. In July of 1990 the couple divorced.

Mr. and Mrs. Todd testified that following the accident they were in casts, confined to wheelchairs and used crutches and walkers during much of the time they remained married. They further testified to the loss of services performed for them by the other spouse due to the injuries sustained in the accident. They also testified that they did not have sexual relations following the accident.

Mrs. Todd testified that following the accident life totally changed and the relationship between herself and Mr. Todd disintegrated. Due to the vast physical restrictions placed on Mr. Todd they were unable to travel or complete any of their retirement plans. She testified that the couple had marital difficulties prior to the acident, but not to the degree that developed after the accident. She attributed a great percentage of their marital difficulties resulting in the divorce to the injuries sustained in the accident.

It is the opinion of this Court that as a result of the accident Mr. and Mrs. Todd each lost consortium from the other from the date of the accident until their divorce in July of 1990. Therefore an award of $25,000 is awarded to each of them for the loss of consortium suffered as the result of Respondent's negligence.

Wherefore, an award totaling $425,000 is awarded to J. W. Todd. Further, an award totaling $325,000 is awarded to Dorothy Todd.